*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

COLLEEN LAVALLEY and ROBERT
LAVALLEY,

UNPUBLISHED
December 22, 2020

Plaintiffs-Appellants,

v

No. 348790
Wayne Circuit Court
LC No. 17-007708-NH

ST. MARY MERCY HOSPITAL, also known as
TRINITY HEALTH-MICHIGAN, FREEDOM
MEDICAL CLINIC, PC, and JAY M. DAITCH,
M.D.,

Defendants-Appellees,

and

MICHIGAN NEURODIAGNOSTICS, PC,
and SALEEM TAHIR, M.D.,

Defendants.

Before: GADOLA, P.J., and RONAYNE KRAUSE and O'BRIEN, JJ.

PER CURIAM.

In this medical malpractice action, plaintiffs, Colleen LaValley and Robert LaValley,[1] appeal by right following the final order entered by the trial court on April 16, 2019. Specifically, plaintiffs challenge the trial court's three previous orders (1) granting summary disposition in favor of Freedom Medical Clinic, PC (FMC) and Jay M. Daitch pursuant to MCR 2.116(C)(7); (2) granting defendant St. Mary Mercy Hospital's (SMMH) motion challenging the sufficiency of plaintiffs' Notice of Intent (NOI); and (3) granting summary disposition in favor of SMMH under MCR 2.116(C)(10) as to vicarious liability for Dr. Saleem Tahir. We affirm.

---

[1] Plaintiffs will be identified by their first names where appropriate.

-1-

## I. FACTUAL BACKGROUND

In November 2014, Colleen sought medical care at the SMMH emergency room for complaints related to persistent nausea and vomiting that had lasted six days. During her first visit, she was noted to be "weak and tired," with "continuous nausea and vomiting which is not clearing." Her medical notes also reflected that she had "advanced HER2 positive breast cancer" and had undergone chemotherapy and surgery. The ER consulted Dr. Harmesh Naik, Colleen's oncologist. Colleen was treated with "aggressive hydration, potassium replacement, IV antiemetic," and dextrose. Plaintiffs note that Colleen was not given thiamine (Vitamin B-1) at that time. The next day, Colleen was feeling well enough to go home and was discharged. However, a few days later, on November 21, 2014, Colleen returned to the SMMH emergency room "with continued complaints of nausea, vomiting, hypokalemia, and new complaints of severe muscle weakness, confusion, ataxia, and nystagmus." Her attending physician during this hospitalization was her primary care provider, Dr. Jay Daitch. Colleen was admitted and again given IV dextrose. Colleen's condition continued to deteriorate. She was seen again by Dr. Naik on November 23, and Dr. Naik sought further consultation with Dr. Saleem Tahir, a neurologist. Dr. Tahir suspected that Colleen's symptoms were the "remote effect of malignancy from carcinoma of the breast with cerebellar ataxia nystagmus, truncal and appendicular ataxia." On November 26, 2014, Dr. Daitch ordered a 100-milligram thiamine tablet (Vitamin B-1) to be administered orally, and Colleen was transferred to the University of Michigan for further evaluation and treatment.

At the University of Michigan, Colleen was diagnosed with and treated for Wernicke's Encephalopathy (WE) before being discharged to a rehabilitation facility. Despite her rehabilitation, Colleen continued to experience a moderate degree of ataxia, dysarthria, and discoordination and was unable to return to work as she was largely wheelchair-bound and required assistance for activities of daily living. Plaintiffs assert that "[a]dministration of glucose without thiamine can precipitate or worsen Wernicke Encephalopathy (WE); thus, thiamine should be administered before glucose." Plaintiffs also assert that oral thiamine is unreliable.

In January 2015, Colleen executed a request and authorization for medical records at SMMH, requesting "all records since May 2014" for personal use. In February 2015, her former attorney, Brian Dailey, wrote a letter to Dr. Daitch's office "in relation to an incident / pattern of incidents of medical malpractice that occurred as a result of a negligent treatment of breast cancer between March 2014 and November." The letter opined that Colleen had been given "improper doses of chemotherapy to treat a tumor in her breast," resulting in "months of agonizing nausea, diarrhea, and vomiting resulting in a diagnosis of Wernicke-Korsakoff syndrome," as well as malnutrition and "severe neurological effects." Thereafter, in March 2015, attorney Dailey's office submitted an authorization for release of information executed by Colleen and specifically requested "admission, consult, lab work and discharge reports only from March 2014 to present." The letter did not mention anything about thiamine.

In May 2016, Colleen discussed the circumstances of her hospitalizations with Dr. Nathaniel Mohney, M.D., during a follow-up visit at the University of Michigan. The clinical notes reflected, in relevant part:

In the interim since her last visit, we have also discussed extensively circumstances regarding the onset of her symptoms. She brought additional information to our attention regarding her initial hospital course beginning in November 2014. There is notation in the records that she presented initially to St. Mary Emergency Department on November 13, 2014 with severe nausea and vomiting. She had no ataxia or confusion at that time. She was subsequently given D5W at 75 ml an hour for what appears to be 1-liter total. She was monitored overnight and had some improvement in her symptoms and was subsequently discharged home. They report that the patient did not receive thiamine, and there was no notation of thiamine in these notes. Her notes also document that the patient was alert and oriented and had no focal neurological deficits. The family then reports that she rapidly deteriorated over the course of the next 3 days to the point where she was confused and did not know the date. She developed severe ataxia and was having recurrent falls at home for which they presented to the St. Mary's Emergency Department again on November 21, 2014. She was admitted to the hospital from the 21st to 26th (and was transferred to University of Michigan on the 26th). They had started to re-supplement her thiamine at the hospital, but were concerned for a paraneoplastic syndrome and subsequently transferred her to the University of Michigan for evaluation of these suspicions which later revealed a thiamine level here of 8 on November 27, 2014, (normal reference range, 8-30). This was after partial thiamine re-supplementation. She had also received steroids initiated at the outside hospital which we continued here.

There were concerns that her presentation is consistent with Wernicke's encephalopathy precipitated by thiamine deficiency from her severe nausea and vomiting that preceded her Emergency Department visit. It also appears that the patient did not receive thiamine prior to starting the D5W. The patient has reached out to our department regarding the actual diagnosis and we have consistently reported that her diagnosis is unclear. It is possible with this new information this raises concern for a nonalcoholic Wernicke's encephalopathy, which we initially entertained; however, her later time course with worsening after her discharge in the spring of 2015 would be inconsistent with the Wernicke's encephalopathy and might suggest a superimposed paraneoplastic cerebellar degeneration for which we have been treating and for which her clinical course has improved with immunosuppression (although with limited results). I discussed with the patient, her husband, and her daughter that although I wish I could provide her with a definitive diagnosis in terms of her decline, this may also be multifactorial. We cannot rule out nonalcoholic Wernicke's encephalopathy and we initially treated this transfer. It is very difficult at the present time to fully confirm this as the sole diagnosis, however. The patient is continuing to pursue legal action against the outside hospital.

On October 31, 2016,[2] plaintiffs served a NOI on SMMH, Dr. Saleem Tahir, and Michigan Neurodiagnostics, PC. This NOI summarized the events related to Colleen's hospitalizations. Dr. Daitch was mentioned three times: once in passing; once noting that he was the attending physician when Colleen was re-admitted on November 21, 2014; and once stating, "On 11/26/14, Dr. Daitch FINALLY ordered thiamine be given, but the order was for a 100mg thiamine tablet (Vitamin B-1)." In parentheses, plaintiffs stated that "oral administration of thiamine is an unreliable initial treatment for WE." The NOI set forth in thorough detail the applicable standards of care or practice applicable to SMMH, Dr. Tahir, and Michigan Neurodiagnostics; it also set forth as to the same parties how the standard of care was breached and the actions the three parties should have taken. Among other assertions, the NOI contended that both SMMH and Michigan Neurodiagnostics were negligent in failing to provide Colleen with the proper and necessary medical care and treatment by failing to employ physicians who possessed the necessary skills to provide the care she needed and failing to "adequately supervise, direct, monitor and control its staff members and staff physicians, assistants and residents." Additionally, the NOI indicated that Dr. Tahir breached the standard of care by failing "to order and administer high dose parenteral therapy, especially but not exclusively prior to the administration of Dextrose," failing to properly diagnose nonalcoholic WE, and failing to properly transfer Colleen to the University of Michigan on November 21, 2014.

On December 16, 2016, plaintiffs served a second NOI on SMMH, FMC, Dr. Daitch, Hope Cancer Clinic, PLLC, and Dr. Naik. Most of the "chronology" set forth in the second NOI was identical to the first, other than the omission of some references to Dr. Tahir and the addition of references to Drs. Daitch and Naik. Plaintiffs also described the standard of care required of FMC and Dr. Daitch, added claims against Dr. Daitch and FMC alleging that each breached the standard of care, and also alleged that SMMH was responsible for Dr. Daitch's acts and omissions.

On April 3, 2017, SMMH responded on behalf of itself and its "agents, employees, staff and subsidiaries," stating in part that all parties complied with the standard of care at all times, and denying responsibility for any alleged departures from the applicable standards of practice or care. A second response, once again denying responsibility, was sent on May 19, 2017.

On May 22, 2017, plaintiffs filed a two-count complaint against Dr. Daitch, FMC, Dr. Tahir, Michigan Neurodiagnostics, PC, and SMMH. The first count of the complaint alleged that Colleen presented for care at SMMH and that each of these defendants, who were involved in her treatments while she remained at SMMH, had breached their duty of care to her and were guilty of negligence and malpractice. In relevant part, plaintiffs alleged that Drs. Daitch and Tahir failed to consider or diagnose WE and failed to properly and timely administer thiamine. Plaintiffs posited that these breaches caused Colleen long-term effects that could have been "significantly ameliorated or prevented," and indicated that she continued to suffer from serious disabilities as a consequence. Plaintiffs indicated that FMC and SMMH were liable for the breaches in care "by way of vicarious liability/ostensible agency." The second count of the complaint sought damages on the same basis for Robert's loss of consortium as a result of Colleen's medical condition.

---

[2] At some time between March 2015 and October 2016, plaintiffs changed counsel from attorney Dailey to present counsel. However, the record is not clear on when that change occurred.

Defendant SMMH denied each of the specific allegations against Dr. Daitch and Dr. Tahir, and it specifically denied that Dr. Daitch was its agent. Simultaneously, SMMH filed a motion challenging the sufficiency of plaintiffs' NOIs. Likewise, FMC and Dr. Daitch denied the allegations of negligence and malpractice by Dr. Daitch. They moved for summary disposition, seeking to dismiss plaintiffs' claim as being time-barred because they were served with the NOI after the two-year limitations period had expired.[3]

The trial court granted the motions after it concluded that plaintiffs' first NOI did not sufficiently set forth claims against Dr. Daitch and did not put SMMH on notice that it was liable for Dr. Daitch's actions. The court further concluded that plaintiffs' second NOI was untimely under the medical malpractice limitations period. It further concluded that the February 2015 letter to Dr. Daitch precluded plaintiffs from relying on the six-month alternative limitations period under the discovery rule; and in any event, plaintiffs had not shown that they could not have discovered their claims against Dr. Daitch and FMC within the two-year limitations period. The trial court dismissed with prejudice all claims involving Dr. Daitch, including those claims against FMC and SMMH that were premised on Dr. Daitch's actions.

SMMH filed an additional motion for summary disposition asserting that it was not vicariously liable for the actions of Dr. Tahir, because he was an independent contractor and not an ostensible agent or employee of the hospital. SMMH argued that it could not be held liable under an ostensible agency theory because Dr. Tahir rendered Colleen care at the request of her personal physicians. Plaintiffs argued that Dr. Tahir had testified during his deposition that he was an employee of SMMH, and Robert testified that he "was under the impression that the Hospital sent Dr. Tahir to see his wife." Plaintiffs also noted that consent was given to the hospital for Colleen's treatment, which supported their belief that Dr. Tahir was one of the hospital's employees and agents. Plaintiffs posited that there was sufficient evidence to create a genuine issue of fact regarding the existence of an ostensible agency relationship between SMMH and Dr. Tahir. However, the trial court granted SMMH's motion for summary disposition on the ground that Colleen's personal physician sought the consultation with Dr. Tahir, so SMMH could not be held liable for Dr. Tahir's conduct.

Plaintiffs now appeal by right from the trial court's order dismissing plaintiffs' claims against Dr. Daitch and FMC as untimely, and the orders dismissing plaintiffs' claims against SMMH for the actions of Dr. Daitch and Dr. Tahir. Dr. Tahir and Michigan Neurodiagnostics settled with plaintiffs and are no longer parties to this matter.

## II. STANDARDS OF REVIEW

This Court reviews de novo the trial court's decision on a motion for summary disposition. *Johnson v Recca*, 492 Mich 169, 173; 821 NW2d 520 (2012). A motion brought pursuant to MCR 2.116(C)(7) tests whether a claim is barred because of "immunity granted by law." MCR 2.116(C)(7). "Summary disposition under MCR 2.116(C)(7) is appropriate when the undisputed

---

[3] There appears to be no real dispute that, absent any tolling or relating-back, the applicable limitations period expired by the end of November 2016. Thus, the first NOI fell within the limitations period, and the second NOI did not.

-5-

facts establish that the plaintiff's claim is barred under the applicable statute of limitations." *Kincaid v Cardwell*, 300 Mich App 513, 522; 834 NW2d 122 (2013). In analyzing a motion for summary disposition under MCR 2.116(C)(7), the trial court must accept as true the contents of the complaint unless contradicted by affidavits, depositions, admissions, or other documentary evidence submitted to the trial court by the movant. *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). "The substance or content of the supporting proofs must be admissible in evidence." *Id*. Further, while the decision whether to dismiss a case with prejudice is generally within the trial court's discretion, the question whether summary disposition under MCR 2.116(C)(7) should be with prejudice is a question of law, which this Court reviews de novo. *Rinke v Auto Moulding Co*, 226 Mich App 432, 439; 573 NW2d 344 (1997).

Additionally, summary disposition under MCR 2.116(C)(10) is proper when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." "Because a motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint, the circuit court must consider the affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion." *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 206; 815 NW2d 412 (2012) (citation omitted).

## III. DISCOVERY RULE LIMITATIONS PERIOD

Before commencing a medical malpractice claim, a plaintiff must provide a NOI that complies with the statutory requirements set forth in MCL 600.2912b(4). Service of a NOI tolls the running of the limitations period for 182 days as to any defendants served. MCL 600.2912b(1); *Trowell v Providence Hosp and Med Ctrs, Inc*, 502 Mich 509, 515; 918 NW2d 645 (2018). Generally, a two-year limitations period applies to malpractice claims. MCL 600.5805(8); MCL 600.5838a(1). Plaintiffs tacitly concede that their first NOI was not served on Dr. Daitch or FMC, so it did not toll any applicable limitations period as to those two parties. Plaintiffs also concede that their second NOI was filed more than two years after the alleged malpractice. However, MCL 600.5838a(2) provides an alternative limitations period of "within 6 months after the plaintiff discovers or should have discovered the existence of the claim." Plaintiffs argue that they did not discover their claims against Dr. Daitch until they received Colleen's medical records in September 2016, so their second NOI was timely under the six-month "discovery" limitations period.

"The burden of proving that the plaintiff, as a result of physical discomfort, appearance, condition, or otherwise, neither discovered nor should have discovered the existence of the claim at least 6 months before the expiration of the period otherwise applicable to the claim is on the plaintiff." MCL 600.5838a(2). Our Supreme Court has clarified that the constructive element of the six-month discovery rule—"should have discovered"—requires an objective inquiry. *Solowy v Oakwood Hosp Corp*, 454 Mich 214, 223; 561 NW2d 843 (1997). A "possible cause of action" standard applies, under which the "period begins to run when, on the basis of objective facts, the plaintiff should have known of a possible cause of action." *Id*. at 222. Under the possible-cause-of-action standard, the plaintiff "need not know for certain that he had a claim, or even know of a likely claim . . ." *Id*. However, "[o]nce a claimant is aware of an injury and its possible cause, the plaintiff is aware of a possible cause of action." *Id* (quotation marks and citation omitted). In evaluating whether a plaintiff was aware of a possible cause of action, "courts should consider the

totality of information available to the plaintiff, including . . . his physician's explanations of possible causes or diagnoses of his condition." *Id*. at 227. "[T]he inquiry is whether it was *probable* that a reasonable lay person would have discovered the existence of the claim." *Jendrusina v Mishra*, 316 Mich App 621, 626; 829 NW2d 423 (2016) (emphasis in original). Notably, the standard is when a lay plaintiff *should* have discovered the potential claim, not when the lay plaintiff merely *could* have discovered the potential claim. See *id*. at 624.

In this case, plaintiffs should have discovered the possible cause of action against Dr. Daitch and FMC over six months before the December 2016 NOI. Indeed, although plaintiffs argue that the claim against Dr. Daitch was not discovered until nearly two years after Colleen's hospitalization, when her second attorney requested and received her medical records in September 2016, this argument is unconvincing in light of the totality of the information available to plaintiffs before the expiration of the limitations period. Notably, in January 2015 Colleen executed a release requesting her medical records from SMMH beginning in March 2014. Plaintiffs then hired attorney Dailey in February 2015, and in his letter to Dr. Daitch, he asserted that Colleen suffered from WE syndrome as a result of Dr. Daitch's alleged medical malpractice and as a result of negligent treatment of breast cancer. In March 2015 Dailey's office also requested a copy of Colleen's relevant medical records from SMMH. Accordingly, plaintiffs had reason to know about the contents of Colleen's medical records and the potential claim over a year and a half before the expiration of the limitations period. Indeed, although the letter from attorney Dailey to Dr. Daitch was premised on liability due to "improper dosages of chemotherapy," rather than thiamine therapy, there is no question that plaintiffs had time to conduct additional discovery to investigate the details of this claim. During this discovery, plaintiffs should have discovered the merits of any other theories. Even if plaintiffs did not have complete records, the six-month period begins when a plaintiff becomes aware of a potential claim, not when the plaintiff has accumulated sufficient medical documentation to prove it. See *Jendrusina*, 316 Mich App at 629-631.

In addition, the notes from Colleen's May 2016 visit with Dr. Mohney at the University of Michigan show that by that time, plaintiffs had enough medical records to allow Dr. Mohney to deduce the possibility that Colleen had been improperly administered glucose without thiamine. Although Dr. Mohney's notes show that he could not provide plaintiffs with a definitive diagnosis, the six-month limitations period begins to run when a plaintiff should learn of a *potentially actionable* diagnosis. *Solowy*, 454 Mich at 215-216. Plaintiffs' deposition testimonies indicate that they learned of the possible thiamine connection from Dr. Mohney, consistent with Dr. Mohney's notes. The record does not definitively show on which date the six-month discovery period began running, but the record does clearly show that it began running absolutely no later than May 2016, when plaintiffs met with Dr. Mohney. Consequently, the six-month discovery period had already run by the time plaintiffs served their second NOI in December 2016. The trial court correctly granted summary disposition in favor of Dr. Daitch, FMC, and SMMH as to vicarious liability for Dr. Daitch, on the basis of the expiration of the statute of limitations.

IV. SUFFICIENCY OF FIRST NOI

Plaintiffs also argue that their first NOI placed SMMH on notice of a claim against it of vicarious liability for Dr. Daitch's actions. We disagree. As noted, the first NOI twice mentions Dr. Daitch in passing and once states that "Dr. Daitch FINALLY ordered thiamine be given, but the order was for a 100mg thiamine tablet." This latter statement, by itself, is highly ambiguous,

-7-

and without context could imply that it was actually Dr. Daitch who finally did the right thing by administering thiamine; in other words, the NOI could be interpreted as stating that out of all the named doctors, Dr. Daitch was the only one not liable for any malpractice. Furthermore, in contrast to the commendably thorough recitation of all of the notice elements required by MCL 600.2912b(4) as to Dr. Tahir and Michigan Neurodiagnostics, the first NOI sets forth *nothing* as to Dr. Daitch. The NOI doesn't include any statement regarding the standard of care that applies to Dr. Daitch or SMMH relative to Dr. Daitch's conduct, does not identify how Dr. Daitch and, by extension, SMMH breached the standard of care, does not indicate what Dr. Daitch and, by extension, SMMH should have done to comply with the standard of care, and does not explain how the allegedly negligent conduct of Dr. Daitch and, by extension, SMMH caused Colleen's alleged injuries. Vague, boilerplate references to other agents or employees, or the need to retain and supervise skilled staff, does not indicate that SMMH was to be held responsible for Dr. Daitch in particular. The assertions set forth in a NOI need not be perfect, but they must provide some degree of detail. See *Roberts v Mecosta Co Gen Hosp (After Remand)*, 470 Mich 679, 691-694, 700-701; 684 NW2d 711 (2004). Moreover, generalized allegations are insufficient. *Id*. at 694.

It is clear that plaintiffs failed to describe with particularity the statutorily required elements relative to Dr. Daitch, even though Dr. Daitch's involvement in the case is clearly set forth in the medical records. Indeed, we agree with SMMH's position that there was nothing preventing plaintiffs from asserting claims against Dr. Daitch with the particularity required by MCL 600.2912b within the first NOI. Plaintiffs also argue that their second NOI should be construed as an amendment or modification of their first NOI. Plaintiffs observe that MCL 600.2301 "allows for amendment of errors or defects, whether the defect is in form or in substance," and "mandates that courts disregard errors or defects when those errors or defects do not affect the substantial rights of the parties." *Bush v Shabahang*, 484 Mich 156, 177; 772 NW2d 272 (2009). However, the omission of Dr. Daitch from the first NOI is clearly not a mere error or defect. A NOI may be corrected under MCL 600.2301 only when the plaintiff has made "a good-faith attempt to comply with the content requirements of [MCL 600.2912b]." *Bush*, 484 Mich at 178. The first NOI is not defective due to a scrivener's error, or accidentally omitting one component of the required content. See *id*. at 178-181. None of the content requirements of MCL 600.2912b(4) were present as to Dr. Daitch in any way. Furthermore, defendants accurately observe that no new information came to light between the first NOI and the second NOI. Rather, plaintiffs simply seem to have decided, belatedly, to add Dr. Daitch to the action. Correction under MCL 600.2301 is unavailable when plaintiffs did not at least make a good-faith effort to comply with MCL 600.2912b(4) as to Dr. Daitch in the first NOI.[4]

Alternatively, plaintiffs argue that even if the second NOI was not a proper amendment, it was still filed timely under the six-month discovery rule given that plaintiffs' attorneys did not receive medical records until after September 22, 2016. Indeed, the parties agree that the second NOI was submitted after the expiration of the two-year limitations period applicable to a medical malpractice action. MCL 600.5805(8); MCL 600.5838a(1). However, as discussed above, the record supports a conclusion that plaintiffs were aware, or should have been aware, of a potential

---

[4] We therefore find it unnecessary to consider defendants' argument that MCL 600.2301 may only be applied in the "furtherance of justice."

claim by May 31, 2016, at the very latest, and therefore, the discovery rule does not apply in this case. Accordingly, given the totality of the circumstances, we conclude that the trial court did not err by dismissing plaintiffs' claims against SMMH for the conduct of Dr. Daitch.

## V. OSTENSIBLE AGENCY

Plaintiffs also argue that the trial court erred by granting summary disposition in favor of SMMH in regard to their claim seeking liability based on Dr. Tahir's conduct because there existed a question of fact regarding whether an ostensible agency relationship existed between SMMH and Dr. Tahir. We disagree.

Our Supreme Court has held that a hospital is not liable for the alleged negligence of independent contractors. *Grewe v Mt Clemens Gen Hosp*, 404 Mich 240, 250; 273 NW2d 429 (1978). Further, this Court has clarified that a hospital is not liable for the malpractice of independent contractors "merely because the patient 'looked to' the hospital at the time of admission or even was treated briefly by an actual nonnegligent agent of the hospital." *Chapa v St Mary's Hosp of Saginaw*, 192 Mich App 29, 33; 480 NW2d 590 (1991). Instead, a hospital can only be held responsible for the conduct of an independent contractor when the plaintiff can establish the creation of an ostensible agency between the medical provider and the hospital as follows:

(1) the person dealing with the agent must do so with belief in the agent's authority and this belief must be a reasonable one, (2) the belief must be generated by some act or neglect on the part of the principal sought to be charged, and (3) the person relying on the agent's authority must not be guilty of negligence. [*Chapa*, 192 Mich App at 33-34.]

"Simply put, [the hospital], as putative principal, must have done something that would create in [the patient's] mind the reasonable belief that [the doctors] were acting on behalf of defendant." *Id*. at 34. However, "the fact that a doctor used a hospital's facilities to treat a patient is not sufficient to give the patient a reasonable belief that the doctor was an agent of the hospital." *VanStelle v Macaskill*, 255 Mich App 1, 11; 662 NW2d 41 (2003).

In this case, there is no evidence to support an ostensible agency claim. Notably, plaintiffs presented no evidence that Colleen reasonably believed that Dr. Tahir was an agent of SMMH. Further, although Colleen was admitted to SMMH, during her stay she was relying on her personal internist, Dr. Daitch, and personal oncologist for care and treatment. Indeed, as plaintiffs concede, it was Dr. Naik who requested that Dr. Tahir complete a neurology consultation. Despite the fact that plaintiffs now claim that they were unaware of Dr. Naik's request, they failed to provide any evidence to support a conclusion that the hospital undertook any act that would support a reasonable belief that Dr. Tahir was acting as its agent. Indeed, while plaintiffs attempt to argue that their belief that Dr. Tahir was acting as an agent of the hospital was supported by various consent forms that were signed allowing treatment by the hospital, none of the consent forms represented that Dr. Tahir was an agent of the hospital. Notably, the forms also did not limit the care provided within the hospital to care that could be provided only by the hospital's agents or employees. Instead, the consent forms allowed the hospital to provide either general or specific treatments and outlined the billing practices of the hospital. Accordingly, we decline to conclude

that the consent forms support a reasonable belief that Dr. Tahir was acting as the hospital's agent during his consultation. In whole, under these circumstances, plaintiffs failed to establish a genuine issue of fact regarding the existence of an ostensible agency, and the trial court did not err by concluding that SMMH cannot be held vicariously liable for Dr. Tahir's conduct.

## VI. DISMISSAL WITH OR WITHOUT PREJUDICE

Plaintiffs finally argue that summary disposition should have been without prejudice, rather than with prejudice. We disagree. Plaintiffs observe that the proper remedy for a technical failure to comply with the notice provisions in MCL 600.2912b, standing alone, is dismissal without prejudice. See *Bush*, 484 Mich at 172-175. However, for the reasons discussed above, plaintiffs' claims are time-barred because any possible limitations period has expired. Dismissal with prejudice is the proper remedy for a time-barred claim. See *Scarsella v Pollak*, 461 Mich 547, 549-552; 607 NW2d 711 (2000). Thus, to the extent we affirm the trial court's grants of summary disposition, we also affirm the trial court's dismissal with prejudice.

Affirmed.

/s/ Michael F. Gadola
/s/ Colleen A. O'Brien

-10-